FILED

2022 Jul-27  AM 10:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **THERESA RUTHERFORD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **2:21-cv-00377-KOB** |
| **LIFE TIME FITNESS, INC.,** ) | |
| ) | |
| **Defendant/Third-Party** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CHRIS RUTHERFORD,** ) | |
| ) | |
| **Third-Party Defendant** ) | |

## <u>MEMORANDUM OPINION</u>

This matter arises on Defendant Life Time Inc.'s motion for summary
judgment. (Doc. 33). On March 29, 2019, Plaintiff Theresa Rutherford suffered
injuries while participating in an exercise class at a Life Time Fitness location in
Vestavia Hills, Alabama. She brings this case against Life Time, asserting a single
count of negligence.

Life Time's motion for summary judgment rests solely on its assertion that
the waiver of liability clause in Ms. Rutherford's membership agreement bars her
claims. The key dispute in this motion arises from the fact that Ms. Rutherford *did
not sign* the 2017 membership agreement that governed her membership when she

1

suffered her injuries. But she *did* sign a nearly identical 2014 membership agreement with Life Time, and her husband[1] signed the 2017 agreement on her behalf. Further, Ms. Rutherford did not oppose her husband's signing the 2017 member agreement, and she attended the fitness class in March 2019 pursuant to that membership. Based on those undisputed facts, the court finds that the 2017 membership agreement's waiver of liability clause binds Ms. Rutherford. So the court will grant Life Time's motion for summary judgment as to Ms. Rutherford's sole negligence claim.

### I.   <u>UNDISPUTED FACTS</u>

#### A. <u>The 2014 Member Usage Agreement</u>

In total, the Rutherfords held three separate family memberships with Life Time Fitness; the first membership lasted from 2014 to 2015, the second lasted for several months in 2016, and the third lasted from 2017 until after Ms. Rutherford suffered her injuries in 2019.

Theresa Rutherford first joined Life Time fitness in 2014, along with her husband, Chris Rutherford, and her two children. Chris Rutherford received a paid membership to Life Time as part of his job at that time. (Doc. 42-1 at 28).

To join Life Time, Ms. Rutherford and Chris Rutherford executed Life

---

[1] Plaintiff and Chris Rutherford divorced around October 2020. *See* (doc. 42-1 at 44). But they were married at the time of Plaintiff's injuries and when the 2017 member agreement was in effect.

Time's "Member Usage Agreement." Ms. Rutherford signed that member

agreement on February 15, 2014, which included the following provisions:

> 1. MEMBERSHIP WITH LIFE TIME. I wish to become a member of Life Time Fitness. . . . In consideration of the benefits of Life Time membership, including but not limited to the Use of Life Time Premises and Services by me, any of my minor children or wards who are Life Time members ("Minor Member(s)"), any other adults on my membership ("Other Member(s)"), or any of my guests ("Guests"), I hereby agree to all of the terms and conditions in this MUA, including the **ASSUMPTION OF RISK, WAIVER OF LIABILITY, DEFENSE AND INDEMNIFICATION,** and **HEALTH AND SAFETY** provisions below.

> . . .

> 2. **ASSUMPTION OF RISK**. I understand that there are **dangers, hazards, and risks of injury or damage, some of which are inherent, in the use of Life Time's premises, facilities, equipment, services, activities, or products**, whether available through membership dues or a separate fee.

> A. Use of Premises and Services. I understand that **use of Life Time's premises, facilities, equipment, services, activities or products** ("Use of Life Time Premises and Services") can include but is not limited to . . . use of personal training services [or] group fitness classes.

> . . .

> I understand that Risks and Injuries in the Use of Life Time Premises and Services (collectively, "Risks of Injury") **may be caused, in whole or in part, by the ORDINARY NEGLIGENCE OF LIFE TIME**, me, Minor Member(s), Guest(s), and/or other persons. **FULLY UNDERSTAND** [*sic*], **AND VOLUNTARILY AND WILLINGLY ASSUME, THE RISKS OF INJURY.**

> 3. **WAIVER OF LIABILITY**. On behalf of myself and my spouse/partner, children/Minor Members, Other Members, Guests, parents, guardians, heirs, next of kin, personal representatives, heirs

and assigns, I hereby voluntarily and forever **release and discharge Life Time from**, covenant and **agree not to sue Life Time for**, and **waive, any claims**, demands, actions, causes of action, debts, damages, losses, costs, fees, expenses or any other alleged liabilities or obligations of any kind or nature, whether known or unknown (collectively, "Claims") **for any Injuries** to me, Minor Member(s), Other Member(s), or Guest(s) in the Use of Life Time Premises and Services **which arise out of, result from, or are caused by any Ordinary NEGLIGENCE OF LIFE TIME**, me, any Minor Member(s), any Guest(s), and/or any other person.

4. **<u>DEFENSE AND INDEMNIFICATION</u>**. On behalf of myself and my spouse/partner, children/Minor Member(s), Other Member(s), Guest(s), parents, guardians, heirs, next of kin, personal representatives, heirs and assigns, **I agree to defend, indemnify and hold Life Time harmless to the fullest extent permitted by law from and against any Claim (including any Negligence Claim) asserted against Life Time by any other person** (including but not limited to any Other Member, any Guest, any other Life Time member or guest, any family member who is not a Life Time member, or any other person or entity) arising out of, resulting from, caused by the Use of Life Time Premises and Services by me, Minor Member(s), Other Member(s), or Guest(s).

(Doc. 34-4 at 118–120) (emphases in original).

Because of the emphasis in the agreement itself, the court reiterates that sections three and four, the "Waiver of Liability" and "Defense and Indemnification" provisions, state that the contracting party signs "on behalf of myself and my spouse" and on behalf of "Other Members." Chris Rutherford's member agreement lists Ms. Rutherford as an "other member."

Chris Rutherford signed an identical member agreement on February 8, 2014. (*Id.* at 115). This reflected Life Time's membership policy that required that

4

each member over the age of eighteen sign a separate member agreement. (Doc. 34-3). Life Time's representative testified that having each adult member sign an agreement ensured each member's "acknowledgement and agreement of the terms of our contract." (Doc. 34-3 at 9). Life Time's procedure for joining included a meeting between the new member and a Life Time staff to discuss the gym's programs, pricing, and the member agreement. (Doc. 34-3 at 9). If an adult member was not present for this initial meeting, Life Time staff typically met with that member on their first visit to discuss the same matters and sign the member agreement. (Doc. 34-3 at 9).

In this case, Chris Rutherford executed the member agreement on February 8, 2014 and Ms. Rutherford executed her identical member agreement on February 15, 2014. Life Time records indicate that Ms. Rutherford used her member card to enter Life Time's facilities seventeen times in 2014, including on February 15, when she signed her member agreement. (Doc. 34-4 at 136).

### B. The Rutherfords' Later Membership Agreements

Chris Rutherford's employer terminated the Rutherfords' original 2014 Life Time membership on November 11, 2015 because he changed employers. (Doc. 34-4 at 117). But the Rutherfords re-joined Life Time at their own expense under an identical family membership plan in February 2016. (Doc. 34-5 at 23).

Life Time's representative explained that former members must sign a new

member agreement contract if they wished to re-join "because it's a new agreement, a new membership." (Doc. 34-3 at 10). In accordance with this policy, Chris Rutherford executed a new membership agreement in February 2016 that was identical to the 2014 agreement. Chris Rutherford signed that member agreement. (Doc. 34-5 at 28). Notably, Ms. Rutherford did not sign a 2016 agreement; the signature box of her 2016 member agreement is blank. (Doc. 34-5 at 36). The Rutherfords then terminated their 2016 membership in June 2016. (Doc. 34-5 at 31).

In 2017, the Rutherfords re-joined Life Time under the membership agreement at issue in this case. Chris Rutherford signed the new member agreement on May 20, 2017. (Doc. 34-2 at 53). That member agreement contained identical terms to the 2016 agreement, which Ms. Rutherford did not sign, and the 2014 agreement, which she did sign. The 2017 member agreement remained in effect when Ms. Rutherford suffered her injuries on March 29, 2019.

But Ms. Rutherford's 2017 member agreement lacks her signature; the box that should contain her signature states, "signature capture not available."[2] (Doc. 34-2 at 85). And the 2017 agreement contains identical terms to the previous agreements, except that it contained a new arbitration provision. (Doc. 34-2 at 83). Life Time does not seek to enforce the arbitration provision.

---

[2] Life Time used an electronic device to capture the member's signature. (Doc. 34-3 at 10).

Life Time records reflect that Ms. Rutherford used her 2017 member card to enter Life Time facilities once in 2017, twice in 2018, and twice in 2019, including March 29, 2019. (Doc. 34-2 at 103). Ms. Rutherford suffered her injuries during that March 29 visit, while participating in a "boot camp" class at Life Time. Chris Rutherford attended the boot camp class with her.

## C. **Ms. Rutherford's Alleged Grant of Authority**

Because Ms. Rutherford did not sign the 2017 member agreement, much of the court's analysis below turns on whether Ms. Rutherford granted Chris Rutherford authority to act on her behalf and on what she understood the terms of her Life Time membership to include. The parties provide the following evidence relevant to those topics.

Ms. Rutherford testified only briefly about the 2014 member agreement. At her deposition in July 2021, she did not remember being present at the Life Time facility or reading the member agreement on February 14, 2014. (Doc. 42-1 at 19). Nor did she remember the waiver of liability clause in that agreement. (*Id.* at 21). But she did testify, "I'm sure I looked over it if I were to sign something." (*Id.* at 20).

When her deposition turned to the 2016 and 2017 member agreements, Ms. Rutherford testified that she did not recall signing those documents or being present when Chris Rutherford did so. (Doc. 42-1 at 24). Life Time's counsel

asked whether Life Time staff ever initiated a meeting with her to discuss the contents of the 2017 member agreement; she testified that she did not recall any such meeting. (Doc. 42-1 at 28).

But Life Time's representative testified that, under Life Time's new-member policy, the mere fact that Life Time had issued Ms. Rutherford a 2017 membership card indicated "that at some point prior to her usage of the card in 2018 she met with someone in the membership department to review the Member Usage Agreement." (Doc. 34-1 at 4).

Ms. Rutherford did admit that she never objected to Chris Rutherford signing the 2016 or 2017 member agreements on her behalf: "Q: Do you recall any discussions with Chris during 2016 about that you didn't want to continue with this membership? A: I don't recall any." (Doc. 42-1 at 24); *see also* (*id.* at 42) "Q: Did you ever take exception to or object to the fact that there was obviously some paperwork that [Chris Rutherford] had to sign and things that had to be recorded— A: I don't think – Q: --in order to go— A: I don't think so. I mean, I don't think it ever came up." And she never objected to Chris Rutherford providing Life Time with credit card information that would permit Ms. Rutherford and her children to charge snacks and other items to the family account. (Doc. 34-2 at 61).

Life Time records reflect that Ms. Rutherford swiped her member card to enter Life Time's facilities on June 19, 2017—barely a month after Chris

Rutherford signed the member agreement on behalf of his family in 2017. (Doc. 34-2 at 103). And she understood that she could only enter the Life Time facility as a member or as a guest of a member. (*Id.* at 29).

The court notes that Life Time devoted much of its reply brief to arguing that Ms. Rutherford fails to genuinely dispute any of the facts that Life Time's initial brief set forth. For example, Life Time asks the court to find it undisputed that Ms. Rutherford actually discussed the terms of the 2017 member agreement with Life Time staff at some point. Taking the factual record in the light most favorable to Ms. Rutherford, the court cannot agree; Life Time only provides evidence that its new-member policy required its staff to meet with Ms. Rutherford to discuss the 2017 agreement terms, not that any such meeting actually occurred. But as explained below, even assuming that Ms. Rutherford never reviewed the terms of the 2017 agreement—as she argues—the court will still grant summary judgment in Life Time's favor.

## II.    LEGAL STANDARD

Courts may grant summary judgment to a movant who shows that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). And the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id*. at 255. Furthermore, the court must view all evidence and inferences drawn from the

underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

### III.   ANALYSIS

At the outset, the court finds Ms. Rutherford's argument difficult to accept. She asserts that "there is no valid 2017 contract which contains an exculpatory clause" between her and Life Time. (Doc. 42 at 16). Yet, she does not deny that she visited the Life Time facility *as a member* from 2014 to 2019, when she was injured. And she does not dispute that she signed a membership agreement in 2014 that contained an identical liability waiver to the 2017 agreement that Chris Rutherford signed on her behalf. Common sense dictates that, if Ms. Rutherford reaped the benefits of the 2017 member agreement, she must also bear the burden of its waiver clause. *See Tuskegee Inst. v. May Refrigeration Co., Inc.*, 344 So. 2d 156, 158 (Ala. 1977) (finding that one may not "receive or retain the benefits of, and at the same time disclaim responsibility for, the measures by which they were acquired") (quoting 3 Am. Jur. 2d, Agency, § 175).[3] So the court struggles to see how no valid contract existed.

To that end, the court finds that the 2017 membership agreement's waiver of liability clause bars Ms. Rutherford's negligence claim for two alternative reasons:

---

[3] Alabama law governs this contract dispute because the court sits in diversity. *See O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir. 1992) ("A federal court in a diversity case is required to apply the laws . . . of the state in which the federal court sits.").

Chris Rutherford acted as Ms. Rutherford's agent in signing the 2017 agreement; and Ms. Rutherford ratified the 2017 agreement by using her membership card. The court also rejects Ms. Rutherford's argument that Alabama public policy prohibits enforcement of the liability waiver. So the court will grant Life Time's motion for summary judgment.

## A.    <u>The Waiver Applies Under Agency Principles</u>

Life Time argues that Chris Rutherford acted as Ms. Rutherford's implied agent when he acted on her behalf in signing the 2017 membership agreement. (Doc. 35 at 19). Ms. Rutherford denies that assertion. (Doc. 42 at 21).

In Alabama, a valid contract may exist despite the absence of a party's signature because "the existence of a contract may also be inferred from other external and objective manifestations of mutual assent." *Ex parte Rush*, 730 So. 2d 1175, 1178 (Ala. 1999). One such manifestation of assent exists under agency law: "mutual rights and liabilities are governed by the apparent scope of the agent's authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny." *Malmberg v. Am. Honda Motor Co., Inc.*, 644 So. 2d 888, 891 (Ala. 1994) (internal quotation omitted). Put differently, "when one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good

faith acts on such belief to his prejudice, the principal is estopped from denying such agency." *Id.*

Ms. Rutherford argues that no Alabama cases have applied apparent agency principles to a liability waiver signed on another's behalf, as in this case. But Alabama courts have found apparent agency when a daughter signed an arbitration provision on her mother's behalf when admitting her to a nursing facility. *See Owens v. Coosa Valley Health Care, Inc.*, 890 So. 2d 983 (Ala. 2004). As here, the mother in *Owens* argued that no binding contract existed between herself and the nursing home because she did not sign the arbitration agreement, and her daughter did not remember reading or discussing the provision when she signed the documents on her mother's behalf. *Id.* at 986. But the Alabama Supreme Court found the mother and the mother's estate bound by the arbitration clause because the arbitration agreement bound the "Patient," which its terms defined to include the admitted patient and her "guardian." *Id.* at 987. The daughter signed the agreement on her mother's behalf as a "guardian."

To be sure, *Owens* concerned an arbitration clause, rather than a liability waiver. But the court finds that case instructive here because the enforceability of the arbitration provision in *Owens* turned on the same issue present here—"the existence of a contract" between the plaintiff and defendant. *See Owens*, 890 So. 2d at 987.

The court finds the contractual terms in this case similar to those in *Owens*. In *Owens*, the Supreme Court found both the mother and daughter bound to the arbitration clause because the contract's "Patient" provision stated that it bound the patient and any "guardian" signing on her behalf. *Owens*, 890 So. 2d at 986. The terms are even more clear here because the 2017 agreement stated that Chris Rutherford signed the liability waiver "on behalf of myself and my spouse/partner." (Doc. 34-5 at 97). And it stated that it bound Chris Rutherford and "all additional members listed above," including "Terry Rutherford." (*Id.* at 93). The court finds that Chris Rutherford's signing these documents on Ms. Rutherford's behalf could "reasonably and in good faith" lead Life Time to believe that Ms. Rutherford had granted Chris Rutherford authority to sign the 2017 member agreement as her agent. *See Malmberg*, 644 So. 2d at 891.

The Rutherfords' marriage relationship further supports this conclusion. In Alabama, "the fact that a husband is the agent of the wife may be implied from circumstances." *J.C. Jacobs Banking Co. v. Campbell*, 406 So. 2d 834, 846 (Ala. 1981). And as the mother-daughter relationship in *Owens* illustrates, a close relationship between the purported agent and principal supports a finding of agency. Here, Chris Rutherford signed the 2017 agreement on his wife's behalf, after having also signed on her behalf in 2016. And the language of Life Time's member agreements explicitly contemplates that a member signs "on behalf of

14

myself and my spouse." (Doc. 34-4 at 118). These "circumstances" strongly "imply" that Chris Rutherford acted as his wife's agent when he signed on her behalf in 2017, just as he had done the previous year. *See J.C. Jacobs Banking Co.*, 406 So. 2d at 846.

   In fact, greater evidence of agency exists in this case than in *Owens* for two reasons. First, evidence exists that Ms. Rutherford actually knew the terms of the 2017 member agreement. Ms. Rutherford does not dispute that she signed the identical 2014 member agreement, which stated that she signed on behalf of her spouse. And Ms. Rutherford knew the terms of the waiver provision of the 2014 agreement because she testified, "I'm sure I looked over it if I were to sign something." (Doc. 42-1 at 20). Ms. Rutherford's signing the 2014 agreement indicated that she knew the extent of the liability waiver—a provision that appeared in identical terms in the 2016 and 2017 agreements that Chris Rutherford signed on her behalf. In other words, the evidence here, unlike that in *Owens*, indicates that Ms. Rutherford actually knew that Chris Rutherford's act of signing the 2017 member agreement also bound her to the waiver. This evidence supports a finding that Ms. Rutherford knowingly "permitted the agent to represent that he possesse[d]" authority to sign the 2017 agreement on her behalf. *See Malmberg*, 644 So. 2d at 891.

   This case differs from *Owens* in a second respect because Ms. Rutherford

repeatedly swiped her way into Life Time's facilities in 2017, 2018, and 2019, while knowing that she enjoyed such access only because she was a member under the terms of the member agreement. Ms. Rutherford admitted to knowing that she could only enter Life Time Fitness and participate in exercise classes if she were a member or a guest of a member. (Doc. 42-1 at 29). And she swiped her way into Life Time within a month after Chris Rutherford signed the family's 2017 member agreement. Ms. Rutherford's use of the member card in 2017 shortly after Chris Rutherford signed the membership documents on her behalf, along with her knowledge that she could swipe into the facility only if she was a member, indicates that she "permitted [Chris Rutherford] to represent that he possesse[d]" authority to sign on her behalf. *See Malmberg*, 644 So. 2d at 891.

Ms. Rutherford tries to distinguish *Owens*, arguing that the daughter in that case was a "known agent" acting on her mother's behalf. (Doc. 42 at 20). But the court finds no more support for "known" agency in *Owens* than in this case. In both situations, the principal permitted the agent to sign an agreement on their behalf by indicating a special relationship with the principal: the guardian-patient relationship in *Owens* and the spouse relationship here. And the Supreme Court in *Owens* rested its finding in part on the mother's failure to make "any objection to [the daughter]'s acting on her behalf." 890 So. 2d at 987. Likewise, Ms. Rutherford testified she never objected to Chris Rutherford's signing the agreement or joining

16

Life Time on her behalf. (Doc. 42-1 at 24). That fact supports a finding that Chris Rutherford acted as Ms. Rutherford's agent.

The court also finds no merit to Ms. Rutherford's attempt to distinguish *Owens* because "two separate agreements were prepared for Plaintiff and Mr. Rutherford." (Doc. 42 at 20). Even though Ms. Rutherford never signed the 2017 member agreement prepared for her, that agreement is irrelevant because the court finds Chris Rutherford signed the 2017 agreement on her behalf. In other words, Life Time typically employed a belt-and-suspenders approach by asking *both* spouses to sign liability waivers on behalf of the other spouse. Although Life Time failed to follow that policy here, the absence of Ms. Rutherford's signed waiver does not undercut the binding nature of the waiver Chris Rutherford signed on her behalf. And as explained above, the court finds stronger evidence of agency because the Rutherfords were spouses—an agency relationship that the contract explicitly contemplates. *See J.C. Jacobs Banking Co.*, 406 So. 2d at 846.

Finally, Ms. Rutherford argues that the liability waiver in the 2017 member agreement does not bind her because Life Time also failed to have her sign a separate waiver form for the "boot camp" class in which she suffered her injuries. (Doc. 42 at 28). Ms. Rutherford correctly notes that Life Time typically required members to sign an *additional* liability waiver before participating in such classes. *See* (doc. 42-2 at 29). But she does not argue that the boot camp waiver in any way

replaced the member agreement waiver; nor does she dispute the terms of the member agreement waiver, which covered "any claims . . . for any injuries" to members and their spouses, including those in "group fitness classes." *See* (doc. 34-4 at 118–19). So Life Time's failure to have Ms. Rutherford sign the boot camp waiver bears no relevance to whether the liability waiver that Chris Rutherford signed in the 2017 member agreement bars Ms. Rutherford's claim.

In sum, the court finds that Chris Rutherford acted as Ms. Rutherford's agent when he signed the 2017 member agreement on her behalf because she knew the contents of that agreement, she did not oppose him joining Life Time on her behalf in 2017, and she and Chris Rutherford's spousal relationship implied an agency relationship under the contractual terms. This evidence supports a finding that Ms. Rutherford led Life Time to a reasonable and good faith belief that Chris Rutherford acted as her implied agent under Alabama law.

### B.   The Waiver Applies Because Ms. Rutherford Ratified the 2017 Member Agreement

Alternatively, Life Time argues that the 2017 liability waiver binds Ms. Rutherford because she ratified the 2017 member agreement by using her membership. (Doc. 35 at 23). The court agrees.

Under Alabama law, "a party, by his actions and acceptance of the benefits of a contract and by operating under that contract, may ratify and confirm it, even though his actual signature is not affixed." *Holmes v. Sanders*, 729 So. 2d 314, 317

18

(Ala. 1999) (quotation omitted). Courts may "infer" ratification when the asserted principal "conducted himself as to evince his purpose to confirm or adopt the unauthorized act of another." *Goldfield v. Brewbaker Motors*, 54 So. 2d 797, 800 (Ala. Civ. App. 1951). But ratification may only occur when the ratifying party acts "with knowledge of the material facts surrounding the transaction." *Tuskegee Inst. v. May Refrigeration Co., Inc.*, 344 So. 2d 156, 158 (Ala. 1977).

As explained above, Ms. Rutherford suffered her injuries while visiting Life Time as a member in 2017. And she admitted *knowing* that she was allowed to enter Life Time's facility only because she was a member. Further, Ms. Rutherford's experience of signing the member agreement in 2014 indicates her knowledge that membership at Life Time included a contractual waiver of liability. These facts indicate that Ms. Rutherford knowingly accepted the benefits of the 2017 member agreement by swiping her member card and, in doing so, "evince[d] her] purpose to confirm or adopt the unauthorized act" of Chris Rutherford in signing on her behalf. *See Goldfield*, 54 So. 2d at 800.

Ms. Rutherford responds that she did not ratify the contract because she lacked "knowledge of the act purportedly ratified." (Doc. 42 at 22) (quoting *Watson v. Auto-Owners Ins. Co.*, 599 So. 2d 1133, 1136 (Ala. 1992)). But the "act" that Ms. Rutherford ratified was Chris Rutherford's joining Life Time Fitness and signing documents on her behalf. And Ms. Rutherford permitted Chris Rutherford

to sign on her behalf in both 2016 and 2017; they made regular payments for their family membership from 2016 to 2019; and Ms. Rutherford enjoyed the benefits of the member agreement by exercising at Life Time Fitness. This conduct indicates her knowledge that Chris Rutherford signed the membership documents on her behalf.

Ms. Rutherford also argues that she lacked "knowledge of the material facts and terms of the 2017 contract." (Doc. 42 at 23). Again, however, Ms. Rutherford ignores her knowledge of the identical 2014 member agreement that she signed— an agreement which contained the same liability waiver as the 2017 agreement. So even though Ms. Rutherford does not recall reviewing the terms of the 2017 member agreement, her signature on the identical 2014 agreement indicates that she knew, at least, that her 2017 membership entailed a liability waiver.

The court will not reward Ms. Rutherford's failure to investigate the 2017 agreement by freeing her from the liability waiver that agreement contained in bolded terms. The Alabama Supreme Court has stated, "[a]ny adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the risk associated with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract." *Alfa Life Ins. Corp. v. Reese*, 185 So. 3d 1091, 1103 (Ala. 2015).

Here, Ms. Rutherford used the 2017 member card, while knowing that her

2014 membership entailed a liability waiver, and while failing to investigate what burdens her 2017 membership entailed. So Ms. Rutherford had *actual knowledge* of the 2014 liability waiver. Based on that fact, the court can at least presume that Ms. Rutherford bore "a conscious appreciation of the risk" of using the 2017 membership card without investigating the terms of membership. *See Alfa Life Ins. Corp.*, 185 So. 2d at 1103. Further, Ms. Rutherford need not have searched far to discover the terms of the 2017 agreement. Life Time staff presented the liability waiver to Chris Rutherford, and he signed on her behalf. So the court *charges* Ms. Rutherford with knowing about the liability waiver because she signed the identical 2014 liability waiver and failed to investigate the terms of the 2017 agreement.

In short, Ms. Rutherford admits that she enjoyed the benefits of the 2017 member agreement, but she now seeks to avoid the burdens that membership imposed. Alabama law does not permit her to avoid the 2017 liability waiver when she also "operat[ed] under that contract." *See Holmes*, 729 So. 2d at 317. So the court finds that Ms. Rutherford ratified the 2017 member agreement that Chris Rutherford signed on her behalf by knowingly using her 2017 membership. And the court charges Ms. Rutherford with knowledge of the material terms of that agreement based on her knowledge of the 2014 liability waiver and her understanding that membership entailed a contractual agreement.

### C.   <u>Waiver Clauses in Alabama</u>

Lastly, Ms. Rutherford argues that Alabama's public policy prohibits parties from contracting out of liability for their own negligence. As support, she cites old Alabama authority stating that "a party may not by contract absolve himself from liability for the negligence of himself or his servants." *See Smith v. Kennedy*, 195 So. 2d 820, 823 (Ala. Civ. App. 1966) (citations omitted). She also cites to *Woods v. U.S. Steel Corporation*, a recent non-binding decision reiterating this general rule, "*subject to certain exceptions.*" No. 2:17-cv-00883-RDP, 2018 WL 6067502, *13 (N.D. Ala. Nov. 19, 2018) (emphasis added). One exception concerns "exculpatory provisions in real property deeds." *Id.* That exception applied in *Woods*, but it has no relevance here because this case does not concern a real property deed.

Another exception exists for a liability waiver, when the contractual party knowingly agrees to it: "Contracts against the consequences of one's own negligence are valid and enforceable only if the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify against the indemnitee's own wrongs." *Ex parte Holland Mfg. Co.*, 689 So. 2d 65, 67 (Ala. 1996) (internal quotation omitted).

Life Time's liability waiver falls under the exception discussed in *Ex parte Holland*. As explained above, the court charges Ms. Rutherford with "knowingly"

agreeing to the waiver provision because she had actual knowledge of the 2014 liability waiver; she knew that membership in 2017 entailed a member agreement; her husband signed on her behalf under the contractual terms and Alabama law; and she assumed the risk of failing to investigate the terms of the 2017 member agreement by using the membership benefits. So the court presumes Ms. Rutherford's knowledge of the 2017 liability waiver, and it will not permit her to avoid that waiver simply because she never personally signed it.

The court also finds that Ms. Rutherford "evenhandedly" agreed to the waiver provision because she authorized Chris Rutherford to sign the 2017 agreement as her agent, as explained above. And she knowingly and willingly ratified that act by using her member card.

So the court rejects Ms. Rutherford's argument that Alabama public policy prohibits enforcement of the waiver provision in this case. And the court finds *Woods* inapplicable here because that case concerned a real property deed, and its reasoning did not discuss other exceptions to the general rule against liability waivers.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, the court will enter a contemporaneous order granting Life Time's motion for summary judgment because the 2017 member agreement's liability waiver bars Ms. Rutherford's negligence claim. The

court finds that Chris Rutherford acted as Ms. Rutherford's agent in signing the

2017 member agreement, or alternatively, that she ratified his signing that

agreement on her behalf.

> **DONE** and **ORDERED** this 27th day of July, 2022.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE